## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| RICHARD A. BLAZEVIC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **CIVIL ACTION** |
| v. ) | |
| ) | **No. 14-2394-JWL** |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Acting Commissioner of Social Security (hereinafter Commissioner) denying Disability Insurance benefits (DIB) under sections 216(i) and 223 of the Social Security Act. 42 U.S.C. §§ 416(i) and 423 (hereinafter the Act). Finding no error, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

## I.      Background

Plaintiff applied for DIB, alleging disability beginning December 10, 2007. (R. 498, 137). The Commissioner denied benefits, and Plaintiff sought judicial review. (R. 715-29). In a Memorandum and Order dated September 24, 2013, the district court found that the Commissioner's decision was not supported by substantial evidence and remanded for further consideration. Id.

On remand, further proceedings were had, another hearing was held on March 25, 2014, and the Administrative Law Judge (ALJ) issued a decision dated April 11, 2014 in which he found Plaintiff is not disabled.  (R. 498-514).  That decision became the final decision of the Commissioner after remand, and on August 8, 2014 Plaintiff again sought judicial review.  (Doc. 1).  Plaintiff claims the ALJ improperly evaluated the opinion evidence, erred in his credibility determination, improperly assessed residual functional capacity (RFC), and erred in relying upon the vocational expert (VE) testimony.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord,

Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining at step four whether, in light of the RFC assessed, claimant can perform his past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the

economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one

through four the burden is on Plaintiff to prove a disability that prevents performance of

past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord,

Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.

At step five, the burden shifts to the Commissioner to show that there are jobs in the

economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084,

1088 (10th Cir. 1999).

The court finds no error as alleged by Plaintiff, and considers each allegation in the

order presented in Plaintiff's Brief.

## II.     Medical Source Opinion Evidence

Plaintiff claims the ALJ erred in evaluating the opinions of Plaintiff's treating

psychiatrist, Dr. Hachinsky; erred in failing to mention opinion statements contained in

the treatment notes of another treating physician, Dr. Kessler; and erroneously failed to

mention the findings of Plaintiff's current therapist or discuss the significance of GAF[1]

scores assigned to Plaintiff.  (Pl. Br. 45-50).  The Commissioner argues that the ALJ's

physical RFC assessment is consistent with or more restrictive than all of the record

opinions regarding physical functioning (Comm'r Br. 3-4); that the ALJ's mental RFC is

consistent with "the vast majority of the medical opinions in the record;" id. at 5; that

---

[1]A Global Assessment of Functioning score is a subjective determination which
represents "the clinician's judgment of the individual's overall level of functioning."  Am.
Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)
32 (4th ed. text revision 2000).

Plaintiff does not explain how Dr. Kessler's treatment notes are inconsistent with sedentary work; id. at 4, n.2; that Tenth Circuit law does not require a discussion of GAF scores; id. at 5, n.3; that in any case the GAF scores assigned are consistent with the RFC assessed; id. at 6, n.4; and that the ALJ's evaluation of Dr. Hachinsky's opinion is supported by the record evidence.  (Comm'r Br. 6-10).

### A.    Standard for Evaluating Opinion Evidence

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources[2] that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis." 20 C.F.R. § 404.1527(a)(2).  Such opinions may not be ignored and, unless a treating source opinion is given controlling weight, all medical opinions will be evaluated by the Commissioner in accordance with factors contained in the regulations.  Id. § 404.1527(c) (effective March 26, 2012); Social Security Ruling (SSR) 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2015).  A physician or psychologist who has treated a patient frequently over an extended period of time (a treating source) is expected

---

[2]The regulations define three types of "acceptable medical sources:"

"Treating source:"  an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. §§ 404.1502, 416.902.
"Nontreating source:"  an "acceptable medical source" who has examined the claimant, but never had a treatment relationship.  Id.
"Nonexamining source:"  an "acceptable medical source" who has not examined the claimant, but provides a medical opinion.  Id.

to have greater insight into the patient's medical condition, and his opinion is generally entitled to "particular weight."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003). But, "the opinion of an examining physician [(a nontreating source)] who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion."  Id. at 763 (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995)).  However, opinions of nontreating sources are generally given more weight than the opinions of nonexamining sources who have merely reviewed the medical record. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) [(1)] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and [(2)] is not inconsistent with the other substantial evidence in [claimant's] case record, [the Commissioner] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2); see also, SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111-15 (Supp. 2015) ("Giving Controlling Weight to Treating Source Medical Opinions").

The Tenth Circuit has explained the nature of the inquiry regarding a treating source's medical opinion.  Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (citing SSR 96-2p).  The ALJ first determines "whether the opinion is 'well-supported by

medically acceptable clinical and laboratory diagnostic techniques.'"  Id. at 1300 (quoting SSR 96-2p).  If the opinion is well-supported, the ALJ must confirm that the opinion is also consistent with other substantial evidence in the record.  Id.  "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight."  Id.

If the treating source opinion is not given controlling weight, the inquiry does not end.  Id.  A treating source opinion is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527."  Id.  Those factors are: (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  Id. at 1301; 20 C.F.R. § 404.1527(c)(2-6); see also Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing Goatcher v. Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th Cir. 1995)).

After considering the factors, the ALJ must give reasons in the decision for the weight he gives the opinion.  Id. 350 F.3d at 1301.  "Finally, if the ALJ rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing so."  Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1996) (quoting Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987)).

7

Recognizing the reality that an increasing number of claimants have their medical care provided by health care providers such as nurse practitioners, physician's assistants, social workers, and therapists, who are not "acceptable medical sources," the Commissioner promulgated SSR 06-3p.  West's Soc. Sec. Reporting Serv., Rulings 327-34 (Supp. 2015).  In that ruling, the Commissioner noted:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.  Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Id. Rulings, 330-31.

SSR 06-3p explains that such opinions will be evaluated using the regulatory factors for evaluating medical opinions; id. at 331-32 (citing 20 C.F.R. § 404.1527); and explains that the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  Id. at 333; see also Frantz v. Astrue, 509 F.3d 1299, 1302 (10th Cir. 2007) (remanding for consideration of a nurse-practitioner's opinions in light of SSR 06-3p).

## B.       The ALJ's Findings

The ALJ's evaluation of the medical opinions encompassed about four pages of his decision.  (R. 507-11).  In that span, he evaluated and accorded weight to the medical opinions of five state agency non-examining sources (Drs. Coleman, Siemsen, Fantz, Warrander, and Stern) and of Plaintiff's treating physician, Dr. Hachinsky, and evaluated and accorded weight to the reports of three non-treating sources who examined Plaintiff at the request of the agency (Drs. Koeneman, McCullough, and Neufeld).  Id.  He accorded "some weight" to the 2008 and 2009 opinions of Drs. Coleman, Siemsen, Fantz, and Warrander.  (R. 507-08).  The ALJ treated two medical source statements prepared by Dr. Hachinsky on August 30, 2010 as a single assessment, and accorded them "no weight."  (R. 508-09).  He gave "substantial weight" to the February, 2011 opinion of Dr. Koeneman, and to the February, May, and June 2013 opinions, respectively, of Drs. McCullough, Coleman (his second opinion), and Stern.  (R. 509-11).  Finally, he accorded only "partial weight" to Dr. Neufeld's opinion dated June 10, 2013.  (R. 510).

## C.    Analysis

Plaintiff argues that the ALJ erred in weighing Dr. Hachinsky's opinion and that Dr. Hachinsky's treating source opinion should have been accorded greater weight, but he does not argue that the weight accorded to the other medical sources' opinions was erroneous.  Rather, he argues that the ALJ should have weighed certain statements in Dr. Kessler's treatment notes, should have discussed the significance of GAF scores assigned by Dr. Koeneman, Dr. Hachinsky, and Plaintiff's therapist, and should have discussed the findings of "plaintiff's current therapist."  (Pl. Br. 45) (without identification).

9

The court finds that the record evidence as cited and explained by the ALJ supports the weight he accorded to each of the opinions of Drs. Coleman, Siemsen, Fantz, Warrander, Koeneman, McCullough, Stern, and Neufeld, and it will not further address those findings except as necessary to address Plaintiff's specific arguments.

Plaintiff's assertion of error in the failure of the ALJ to "discuss the significance of any of the GAF scores assigned to plaintiff" (Pl. Br. 45), is without merit.  In two footnotes in her brief, the Commissioner argues that a GAF score can be entirely unrelated to a claimant's functioning, and cites to unpublished decisions of the Tenth Circuit to support her argument that an ALJ does not err in failing to discuss GAF scores. (Comm'r Br. 5, 6, nn.3, 4).

As the Commissioner's Brief implies, in August 2000 the Commissioner revised the Mental Impairment Listings, and explained the decision not to discuss the GAF scale in subparagraph 12.00D (Documentation) of those listings.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (August 21, 2000).  In the explanation, the Commissioner noted that two commenters recommended discussing the GAF scale in Subparagraph 12.00D.  Id. at 50,764.  The Commissioner explained that the GAF scale "is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association," but that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings." Id. at 50,764-65.  This explanation expresses the Commissioner's finding that a GAF score does not directly correlate to the criteria in the Listings.  Therefore, a GAF score, by

itself, does not suggest the severity of a claimant's impairments under the regulations, and does not suggest particular functional limitations resulting from mental impairments.

An ALJ is not required to discuss every piece of evidence.  But, he must discuss the uncontroverted evidence he chooses not to rely upon, and any significantly probative evidence he decides to reject.  Wall, 561 F.3d at 1067 (citing Frantz, 509 F.3d at 1303); see also, Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996) ("in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects").  However, Plaintiff has not established in this case that the GAF scores to which he cites are either uncontroverted or significantly probative evidence.  As noted above a GAF score does not directly correlate to functional limitations or to the severity of a mental impairment.  Therefore, such a score is not significantly probative of disability. Moreover, as the Commissioner points out, one of the scores on which Plaintiff relies is a GAF score of 50 assigned by Dr. Koeneman.  Yet, Dr. Koeneman opined that Plaintiff is capable of working, and the ALJ accorded "significant weight" to Dr. Koeneman's opinion.  Therefore, to the extent that the GAF scores of 50 and 45 assigned by Dr. Hachinsky and Plaintiff's therapist suggest that Plaintiff is disabled, they are not uncontroverted.  Plaintiff can show no error in the failure to discuss the GAF scores.

Plaintiff's allegation of error in the failure to mention the findings of his therapist is equally unavailing.  Plaintiff does not identify his therapist, or (other than referring to a GAF score of 45) point to any functional limitations which were suggested by the

therapist.  Plaintiff's Brief cites to a treatment note (R. 1151) apparently completed by his therapist which contains a GAF assessment of "45," and the court has thereby identified Exhibit 46F as the treatment notes of Plaintiff's therapist, which are signed by Kristy N. Cramer, MA, LPC.  The court is unable to discover any opinion in those notes (beyond the GAF score discussed above) which can be construed as an opinion which is clearly contrary to the ALJ's RFC assessment.  Plaintiff has shown no opinion presented by his therapist which should have been considered by the ALJ.

Plaintiff complains that the ALJ did not mention Dr. Kessler's statements that Plaintiff was "hindered" by his pain and his pain medication, and that Plaintiff was weak, on narcotic medications that made him tired, and could not work or even complete activities of daily living.  (Pl. Br. 45 & n.12) (citing R. 1110, 1141).  In a footnote to her Brief, the Commissioner suggests that Dr. Kessler's statements are not medical opinions, and argues that the treatment notes relied upon by Plaintiff merely contain his subjective symptoms or Dr. Kessler's examination findings, and that Plaintiff does not explain "how those symptoms or findings are inconsistent with sedentary work."  (Comm'r Br. 4, n.2) (citing R. 1110,1141).  In his Reply Brief, Plaintiff argues that contrary to the Commissioner's Brief, Dr. Kessler stated in the "Plan" section of his treatment notes that "plaintiff 'cannot work as he cannot even complete adl.' " (Reply 3) (quoting R. 1142).

As Plaintiff suggests, in a treatment note dated October 24, 2012, Dr. Kessler reported "New symptom(s)" including that Plaintiff is "hindered seecondary [sic] to pain and the pain meds which cause drowsiness."  (R. 1110).  Plaintiff also relied upon a

treatment note dated June 3, 2013.  (R. 1141-42).  At the end of that treatment note, Dr.

Kessler provided his "Plan" in which, for 7 lines of text, he explained that he was going

to continue several medications in certain dosages, strengths, methods, and periods.  (R.

1142).  At the end of that "Plan," the treatment note states:  "patient cannot work as he

cannot even complete adl [presumably 'activities of daily living'].  he [sic] is weak and

on narcotics for the pain and it makes him tired, and constipated."  Id.

      The court finds no error in the ALJ's failure to evaluate these statements as

medical opinions or to explain the weight accorded to them.  First, the decision makes

clear that the ALJ considered Dr. Kessler's treatment notes, because he summarized

evidence from those treatment notes and cited to those notes in his decision.  (R. 501)

(noting a recent diagnosis of hypogonadism, and citing Ex. 44F); (R. 504-05) (noting

treatment for back and neck pain and citing Ex. 37F); (R. 505) (noting a history of

coronary artery disease and citing Exs. 37F, 44F, and 45F).  As the Commissioner noted,

Dr. Kessler's statement that Plaintiff was "hindered" by pain and his pain medications (R.

1110), was merely a repeat of Plaintiff's report of his symptoms, and makes no mention

of any quantified or quantifiable limitation resulting from those symptoms.  Dr. Kessler's

note that Plaintiff is weak and that his narcotic pain medications make him tired and

constipated (R. 1142) is similarly flawed.  These statements simply do not reflect a

medical opinion which must be evaluated by the ALJ.  Plaintiff can show no prejudice

resulting from a failure to specifically mention or evaluate them.

Dr. Kessler's statement - "patient cannot work as he cannot even complete adl," could certainly be viewed as a medical opinion, but Plaintiff has not shown that it is the medical opinion of Dr. Kessler, or even if it is, that the ALJ should have noticed it, much less should have discussed it.  As the Tenth Circuit has explained the court cannot insist on technical perfection in the ALJ's evaluation of the medical evidence.  Keyes-Zachary v. Astrue, 695 F.3d 1156, 1166 (10th Cir. 2012).  Common sense should be the court's guide.  Id.  The statement appears to be a random comment buried at the end of the doctor's plan of treatment for Plaintiff.  The statement itself says nothing regarding the plan for treating Plaintiff, and it relates in no way, logical or otherwise, to that plan.  A review of all of Dr. Kessler's treatment notes reveals that in the "plan" section the doctor consistently states in a logical presentation his plan for continued treatment of Plaintiff--the medications to be used, laboratory tests planned, and/or ordered, radiological studies planned and/or ordered, and so forth.  (R. 1106-18, 1139-50).  Nowhere else does Dr. Kessler's treatment notes reflect such a random, disconnected comment as that reflected here.  Id.  This statement is at the end of an otherwise logical and detailed presentation of the doctor's plan for medications to be used in treating Plaintiff.  Then, without any separation or other explanation, the statement appears without support--that Plaintiff cannot work or complete activities of daily living.  Moreover, nowhere in that treatment note is there any discussion of any specific problems with Plaintiff's ability to work or ability to complete activities of daily living.  And, immediately following the statement, is another interjection of certain of Plaintiff's symptoms--Plaintiff is weak and his narcotic

14

pain medications make him tired and constipated.  It is no wonder that after having

reviewed Dr. Kessler's earlier treatment notes the ALJ did not discuss this "opinion" of

Dr. Kessler.  More than likely, he did not even notice it.  Applying the common sense

standard, the court cannot find error.  The ALJ thoroughly explained his evaluation of the

medical opinions, and the record evidence supports his findings.  This single, random

"opinion" about an issue reserved to the Commissioner could not affect that analysis.

The ALJ devoted more than a page in his decision to discussion and consideration

of Dr. Hachinsky's opinions.  (R. 507, 508-09).  He summarized Dr. Hachinsky's letter

dated April 8, 2007 (R. 507), and he summarized and accorded weight to the medical

source statements provided by Dr. Hachinsky and dated August 30, 2010.  (R. 508-09).

The ALJ noted that in its remand order, the district court had instructed the Commissioner

to recontact Dr. Hachinsky for clarification of the inconsistencies in his opinions, and he

explained that he had recontacted Dr. Hachinsky, but that Dr. Hachinsky had not

responded.  (R. 508).  He accorded "no weight" to Dr. Hachinsky's opinions because Dr.

Hachinsky stated his opinions were supported by Plaintiff's subjective reports, and

because the opinions were "internally inconsistent, inconsistent with each other, [and]

inconsistent with the record as a whole."  (R. 508).

Apparently alluding to the requirement that an ALJ must determine whether a

treating source opinion is worthy of controlling weight, Plaintiff argues that the "ALJ

never made a specific determination as to whether the opinions of Dr. Hachinsky were

'well-supported by medically acceptable clinical and laboratory diagnostic techniques'

per SSR 96-2p." (Pl. Br. 47). While it is true that the ALJ did not state whether Dr. Hachinsky's opinions are supported by such techniques, he did state that the opinions are inconsistent with the other substantial evidence in the record. (R. 508). The Tenth Circuit has held that if an "opinion is deficient in <u>either</u> of these respects, then it is not entitled to controlling weight." <u>Watkins</u>, 350 F.3d at 1300 (emphasis added). The ALJ found that Dr. Hachinsky's opinion is inconsistent with other record evidence, and he did not accord controlling weight to the opinion. That is sufficient, and it is not error.

Plaintiff also argues that it was error to discount Dr. Hachinsky's opinion because it was based on Plaintiff's subjective allegations. (Pl. Br. 47). He argues that there is no indication Dr. Hachinsky believed Plaintiff was exaggerating, and that psychiatrists must base their opinions upon their patients' reports and their interactions with and observations of their patients. (Reply 2) (citing <u>Langley v. Barnhart</u>, 373 F.3d 1116, 1122 (10th Cir. 2004)).

"In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports." <u>McGoffin v. Barnhart</u>, 288 F.3d 1248, 1252 (10th Cir.2002). The Tenth Circuit has explained that where the ALJ has no <u>evidentiary basis</u> for finding that a treating physician's opinion is based only on plaintiff's subjective complaints, his conclusion to that effect is merely speculation which falls within the prohibition of <u>McGoffin</u>. <u>Langley v. Barnhart</u>, 373 F.3d 1116, 1121 (10th Cir. 2004). Such a conclusion by the ALJ must be based upon evidence taken from the physician's records. <u>Victory v. Barnhart</u>, 121 F. App'x 819, 823-24 (10th Cir. 2005).

16

Here, the ALJ noted that Dr. Hachinsky stated that Plaintiff's report was the factor

supporting his opinion (R. 508) (citing Ex. 24F/2), and the ALJ's finding is correct.  One

of the medical source statements Dr. Hachinsky completed asked the physician to

"[i]dentify the factors . . . that support your assessment," and the only factor identified by

Dr. Hachinsky was "pt report."  (R. 490).  The ALJ's finding was specifically based upon

this evidence taken from Dr. Hachinsky's records in accordance with the law in the Tenth

Circuit.  The ALJ's finding is justified.  Moreover, that finding was only one of several

reasons relied upon by the ALJ to discount Dr. Hachinsky's opinion.  This is not error.

Plaintiff argues that Dr. Hachinsky's two medical source statements "are actually

generally consistent" (Pl. Br. 48), that merely finding the opinions inconsistent is

insufficient, and that other record evidence was also consistent with Dr. Hachinsky's

opinions.  (Pl. Br. 49).  And, in his Reply Brief, Plaintiff argues that the ALJ should have

reviewed the other reports to see if they outweigh Dr. Hachinsky's report, not the other

way around.  (Reply 3) (citing Reyes v. Bowen, 845 F.2d 242, 245 (10th Cir. 1988)).

The fact that there are also consistent findings between Dr. Hachinsky's statements

does not negate the ALJ's finding of inconsistencies.  Plaintiff does not, and cannot,

argue that there are no inconsistencies between the two statements--which, as the ALJ

noted, are dated the same day.  To the extent that Plaintiff points out consistencies

between the statements, and with other record evidence, he does not argue that the ALJ's

findings are wrong or are not supported by record evidence.  Plaintiff must demonstrate

the error in the ALJ's rationale or finding; the mere fact that there is evidence which

17

might support a contrary finding will not establish error in the ALJ's determination.  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966) (same).

To the extent Plaintiff argues that the ALJ did not review the other medical opinions to see if they outweigh Dr. Hachinsky's report, the court finds no basis for that argument.  As noted above, the ALJ evaluated the medical opinions of nine doctors, including Dr. Hachinsky, and explained his findings in his decision.  He accorded "some weight," "partial weight," and "substantial weight" to the opinions of eight of those doctors, and "no weight" to Dr. Hachinsky's opinion.  And, he stated his reasons for doing so.  It is abundantly clear that the ALJ reviewed those medical opinions and determined that they outweigh Dr. Hachinsky's report.

Plaintiff also argues that the "ALJ did not discuss the weight he assigned the opinions of Dr. Hachinsky in his letter of April 8, 2010."  (Pl. Br. 45).  The Commissioner responds that "it would have been preferable for the ALJ to have addressed this letter" (Comm'r Br. 8), but she argues that the letter does not provide functional limitations, and that the ALJ's thorough analysis of the record makes it clear that he afforded little weight to the opinions, if any, expressed in the letter, and why.

18

(Comm'r Br. 8-9).  In his Reply Brief, Plaintiff argues that there are "express limitations

in Dr. Hachinsky's letter, such as his statement that plaintiff's [sic] anxiety caused him to

become homebound for a long period of time, he was unable to drive even as a passenger

[sic] in a car, he needed structure and routine with no variables to contend with and,

importantly, his symptoms prevented him from maintaining steady employment."  (Reply

1-2) (citing R. 444-45).

The court notes that in his decision, the ALJ specifically addressed Dr.

Hachinsky's letter:

> On April 8, 2010, Dr. Hachinsky drafted a letter on behalf of the claimant
> (Exhibit 20F).  In the letter, Dr. Hachinsky noted the claimant has trouble
> driving, avoids driving and public situations, and has anxiety and
> nightmares secondary to his PTSD (Exhibit 20F/1).  Dr. Hachinsky also
> noted the claimant has experienced a modicum of improvement in his
> symptoms over the last year, but continued to have significant anxiety
> (Exhibit 20F/1).  Dr. Hachinsky further noted the claimant's ability to leave
> the house had improved aud he seemed to function better with structure and
> a routine (Exhibit 20F/1).

(R. 508).  This is a fair summary of the substance of Dr. Hachinsky's letter, and Plaintiff

does not argue otherwise.  Moreover, contrary to Plaintiff's argument, the letter simply

does not contain any functional limitations opined by Dr. Hachinsky.  As but one example

of that fact, the letter states:  "He currently <u>says</u> that he struggles with anxiety in

situations that he has no control over [sic] and that he seems to function better with

structure and routine but has troubles if there are variables in his routine."  (R. 444)

(emphasis added).  Plaintiff's assertion that Dr. Hachinsky opined that Plaintiff "needed

structure and routine with no variables to contend with," is no more than a restatement of

Plaintiff's report to Dr. Hachinsky regarding his symptoms.  And, it is a restatement which ignores what Dr. Hachinsky actually wrote.

The closest thing to an opinion in Dr. Hachinsky's letter is his statement that "I am very concerned about [Plaintiff's] ability to maintain steady employment at the present time due to his symptomatology."  (R. 445) (emphasis added).  Even that statement is not an opinion.  It expresses Dr. Hachinsky's uncertainty regarding Plaintiff's ability, rather than his opinion that Plaintiff can or cannot maintain steady employment.  Moreover, it reveals that even Dr. Hachinsky's uncertainty is based upon Plaintiff's report of symptoms.  There is no error in the ALJ's failure to have said more regarding Dr. Hachinsky's letter.

## III.    Credibility

Plaintiff claims the ALJ erred in making his credibility determination.  He asserts that the record is "replete with evidence of plaintiff's [sic] severe anxiety disorder and its disabling effect."  (Pl. Br. 50).  He argues that the ALJ discussed little of that evidence in his credibility analysis, and that the evidence he did discuss does not support his conclusions.  Id. at 51.  Plaintiff argues that the ALJ erred in finding inconsistencies regarding his ability to care for himself between Plaintiff's April, 2013 functional report and his testimony at the hearing.  Id. at 52.  He denies the ALJ's finding that Plaintiff's mental health treatment has been "routine, infrequent and conservative," id. at 53, and discusses the evidence which in his view supports a finding of credibility.  He argues that although the ALJ mentioned the testimony of Plaintiff's wife, the ALJ erred when he

20

failed to assign weight to her opinions as a medical professional or as Plaintiff's wife.  Id. at 54.  He concluded that Plaintiff "should have been found fully credible."  Id. at 54. The Commissioner argues that the ALJ provided good reasons supported by record evidence to discount Plaintiff's allegations, and that the court should, therefore, defer to the ALJ's credibility finding.  (Comm'r Br. 10).  With regard to the testimony of Plaintiff's wife, the Commissioner points out that an ALJ is not required to make specific findings regarding lay witness testimony so long as his decision reflects he considered it, and that any error in considering the testimony was harmless because the testimony is cumulative of Plaintiff's allegations--which the ALJ discounted.  (Comm'r Br. 13-14).

## A.    Standard for Evaluating Credibility

The framework for a proper credibility analysis is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987).  An ALJ must consider (1) whether the claimant has established a symptom-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's symptoms are in fact disabling.  See, Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993) (explaining the Luna framework).  The Commissioner has promulgated regulations suggesting relevant factors to be considered in evaluating credibility:  Daily activities; location, duration, frequency, and intensity of symptoms; factors precipitating and aggravating symptoms; type, dosage, effectiveness, and side effects of medications taken to relieve symptoms; treatment for symptoms;

21

measures plaintiff has taken to relieve symptoms; and other factors concerning limitations or restrictions resulting from symptoms.  20 C.F.R. § 404.1529(c)(3)(i-vii).  The court has recognized a non-exhaustive list of factors which overlap and expand upon the factors promulgated by the Commissioner.  Luna, 834 F.2d at 165-66.  These factors include:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Thompson, 987 F.2d at 1489).

The court's review of an ALJ's credibility determination is deferential.  Credibility determinations are generally treated as binding on review.  Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983).  "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence.  Wilson, 602 F.3d at 1144; accord Hackett, 395 F.3d at 1173.

## B.      The ALJ's Credibility Determination

Early in his RFC assessment, the ALJ explained the standard for evaluating credibility, summarized Plaintiff's allegations regarding disability, and noted that he found Plaintiff's allegations of symptoms not credible "for the reasons explained in this decision."  (R. 503-04).   Next, he summarized the medical evidence and evaluated the

medical opinions. (R. 504-11). Finally, he explained six reasons for discounting the credibility of Plaintiff's allegations. (R. 511-12). He found (1) that Plaintiff's activities of daily living are inconsistent with his allegations of disability: (2) that his mental health treatment has been routine, infrequent, and conservative; (3) that Plaintiff testified his mental health medication helps; (4) that Plaintiff has not been compliant with his treating providers recommendations; (5) that the record documents improvement when Plaintiff complies with treatment recommendations; and (6) that Plaintiff has worked during the time he alleged disability. (R. 511-12).

### C.   Analysis

As the Commissioner argues, the ALJ determined Plaintiff's allegations of symptoms resulting from his impairments are not entirely credible, and provided reasons in support of his determination. The court finds that those reasons are supported by record evidence.

Plaintiff first argues that the ALJ erred in finding that Plaintiff's activities of daily living are inconsistent with his allegations of disability. He argues this is so because the ALJ recognized that Plaintiff reported in his 2013 function report he needed assistance with his personal care, but the ALJ found this report was inconsistent with Plaintiff's hearing testimony despite that "both plaintiff [sic] and his wife testified he needed assistance." (Pl. Br. 52). The ALJ's finding that Plaintiff's activities of daily living are inconsistent with his allegations of disability was based on more than this one factor. Moreover, the ALJ's analysis of this factor is supported by the record evidence. After

citing record evidence that Plaintiff can provide his own personal care (in addition to

record evidence that Plaintiff prepares meals, helps his children get ready for school,

drives a limited amount, shops, does some laundry, manages his finances, washes dishes,

and performs minimal household chores), the ALJ explained:

> However, in April 2013, he reported he could not provide for his own
> personal care without assistance (Exhibit 29E [(Plaintiff's Function Report -
> Dated April 16, 2013)]).  Contrary to the April 2013 functional report,
> during the hearing, the claimant testified he provides for his own personal
> care, drives four times per week, and uses the computer

(R. 511).  This explanation is supported by the record evidence.  Plaintiff testified that he

drives more than once a week, and when pressed, he testified he drives "[m]aybe four

times" a week.  (R. 602).  He also testified that he uses a computer.  (R. 613-14).

    With regard to personal care, in his April 2013 function report, Plaintiff reported

that he is unable to perform daily tasks such as dressing and grooming and that he can

"move from bed to couch" "with assistance."  (R. 942).  In the section of the function

report specifically titled "Personal Care," Plaintiff stated, "All activities are very limited,"

and that "wife must assist" with dressing, bathing, care for hair, and shaving.  (R. 943).

He stated that he can feed himself and that in using the toilet his wife will "assist to

bathroom."  (R. 943).

    Plaintiff's hearing testimony with regard to personal care is reproduced here:

Q      Do you have any trouble dressing yourself?

A      Yeah, my wife has to help.

Q      What does she have to do?

A        She'll help me with my shoes and socks, if we have to go
         somewhere, otherwise I'll just wear sweats and house shoes or flip-
         flops, something I can slip on.

Q        And why is that, that she needs to help you?

A        I can't bend over to tie my shoes and stuff.

Q        Do you have any trouble bathing or showering?

A        It's painful.  I can't, you know, I do the best I can.

Q        What, what problem do you have with that?

A        Bending -- any kind of bending -- that's the other thing --
         it's just within arm's reach.  I've got like a sponge that she got me
         thing [sic], so I don't have to bend.

(R. 620-21).

Plaintiff's hearing testimony was that bending is a problem, and that his wife helps

him overcome that problem by helping him put on shoes and socks when he goes

someplace requiring tie shoes, and that she got him a "sponge thing" for use in the shower

or bath.  On the other hand, his function report states that he can move from bed to couch

only "with assistance," that all personal care activities are very limited, and that all except

feeding himself require assistance.  The ALJ did not err in finding inconsistency between

Plaintiff's hearing testimony and his 2013 function report, or in concluding that

"claimant's wide range of activities of daily living leads the undersigned to find the

claimant's allegedly disabling impairments are not as significant as alleged."  (R. 511).

Plaintiff's claim that the "ALJ did not discuss or consider type, dosage,

effectiveness and side effects of plaintiff's [sic] medication" (Pl. Br. 52), is also incorrect.

The ALJ clearly considered and discussed this factor because he noted in the decision that Plaintiff's hypertension is controlled with medication (R. 501, 506), that Plaintiff reported "memory problems and difficulty concentrating secondary to his medications" (R. 504), that Ms. Blazevic testified that Plaintiff's mental medication helps (R. 504, 512), and that Plaintiff reported "his medication was helping him sleep."  (R. 506).  Moreover, the ALJ specifically noted that the standard for evaluating credibility required him to consider "the type, dosage, effectiveness, and side effects of any medication."  (R. 511).

Plaintiff claims the ALJ erred in finding that his mental health treatment has been routine, infrequent, and conservative because Plaintiff "saw Dr. Hachinsky on eight occasions over a two and a half year period" (Pl. Br. 53), and "recently found a therapist nearby, which the ALJ neglected to acknowledge."  (Pl. Br. 54).  Contrary to Plaintiff's claim, the ALJ specifically acknowledged the testimony of both Plaintiff and his wife that he had been seeing a therapist monthly for the four or five months immediately before the hearing.  (R. 504, 511).  Moreover, the ALJ cited the therapist's treatment notes when summarizing Plaintiff's mental health treatment.  (R. 506) (citing Ex. 46F).  While it is true that Plaintiff saw Dr. Hachinsky eight times over a two and a half year period, it is also true, as the ALJ specifically noted, that Plaintiff had not seen a psychiatrist since he last saw Dr. Hachinsky "in August 2010, more than three years ago."  (R. 511).  The ALJ did not err in finding that Plaintiff's mental health treatment has been routine, infrequent, and conservative.

Plaintiff's assertion that there is also record evidence which could support a finding that Plaintiff's allegations are credible is merely an invitation to the court to reweigh the evidence and substitute its judgment for that of the ALJ.  That is a course which the court is forbidden to take.  <u>Bowman</u>, 511 F.3d at 1272; <u>accord</u>, <u>Hackett</u>, 395 F.3d at 1172.  As noted above, the court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  <u>Lax</u>, 489 F.3d at 1084 (citations, quotations, and bracket omitted); <u>see also</u>, <u>Consolo</u>, 383 U.S. at 620 (same).

Finally, Plaintiff cannot show error in the ALJ's failure to accord specific weight to the lay opinion of Plaintiff's wife, either as his wife, or as a medical professional.  In the Tenth Circuit, an ALJ is not required to make specific, written findings regarding third party credibility when the written decision reflects that the ALJ considered the statements.  <u>Blea</u>, 466 F.3d at 914-15; <u>Adams v. Chater</u>, 93 F.3d 712, 715 (10th Cir. 1996).  In <u>Adams</u>, the court "decline[d] claimant's invitation to adopt a rule requiring an ALJ to make specific written findings of each witness's credibility, particularly where the written decision reflects that the ALJ considered the testimony."  93 F.3d at 715.  The <u>Adams</u> court determined "that the ALJ considered the testimony of claimant's wife in making his decision because he specifically referred to it in his written opinion," and the court found no error in the ALJ's failure to make specific, written findings regarding the testimony.  <u>Id.</u>  Thirteen years later, the Tenth Circuit confirmed the rule that an ALJ is

27

not required to make specific written findings of credibility regarding a third-party statement if the decision reflects that the ALJ considered it.  <u>Blea</u>, 466 F.3d at 915.

Here, as in <u>Adams</u>, the ALJ specifically acknowledged and discussed the statements of Plaintiff's wife.  In fact, as cited above, he discussed them several times. Therefore, it was not error to fail to specify the quantum of weight accorded her opinions. Beyond her background as a nurse, there is no indication that Ms. Blazevic was medically involved in, or had any special medical expertise in the treatment of Mr. Blazevic, or that she testified or was qualified at the hearing to testify as a medical expert in this case.

## IV.   RFC Assessment

Plaintiff claims, in part, that the ALJ erred in his RFC assessment because he erred in weighing the medical source opinions and provided an inadequate credibility analysis. As discussed above, the court found no error in these matters, and they did not result in error in the ALJ's RFC assessment.

Plaintiff also claims however, that the ALJ erred in finding Plaintiff can occasionally bend, and in failing to explain how Plaintiff "would be expected to arrive at his workplace" even though the ALJ determined Plaintiff should not drive in his work. (Pl. Br. 55-56).  The Commissioner argues that the representative jobs provided by the vocational expert and accepted by the ALJ do not require stooping in any case, and that although "the ALJ reasonably concluded that Plaintiff should not drive as a profession, the record simply does not support Plaintiff's argument that he cannot drive at all." (Comm'r Br. 14-15).  The court finds no error in these claims.

28

The ALJ did not find that Plaintiff can occasionally bend, as Plaintiff's claim of error alleges. Rather, he found that Plaintiff can occasionally stoop. (R. 503). However, Plaintiff appears to recognize this because his specific argument was that "[a]n individual must be able to bend (stoop) occasionally in order to perform substantially all the requirements of most sedentary jobs." (Pl. Br. 55) (citing SSR 85-15 (without pinpoint citation)).

SSR 85-15 defines "stoop" as "to bend the spine alone," as opposed to bending both the spine and legs (crouching), or bending the legs alone (kneeling). 1985 WL 56857 at *2. That ruling provides that "[i]f a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." Id. at *7. Plaintiff argues that he cannot stoop because Plaintiff and his wife testified he cannot bend and because "Dr. McCullough [ ] noted plaintiff [sic] could only bend 45 degrees. (Pl. Br. 55) (citing R. 1030, 1035).

As far as the testimony of Plaintiff and his wife are concerned, the ALJ found Plaintiff's allegations only partially credible, and the court finds no error in that finding. With regard to Dr. McCullough's opinion, Plaintiff does not acknowledge all of Dr. McCullough's opinion. Dr. McCullough opined both that Plaintiff's "lumbar spine was limited to 45 degrees of flexion," and that his cervical spine is limited to "20 degrees forward flexion." (R. 1030) see also, (R. 1035) (showing 45 degrees flexion of the lumbar spine and 20 degrees forward flexion of the cervical spine). The ALJ accorded "substantial weight" to Dr. McCullough's opinions. (R. 510). Plaintiff has not shown

29

that 45 degrees of lumbar flexion in combination with 20 degrees of cervical flexion is insufficient ability to stoop to perform the limited range of sedentary work assessed by the ALJ.  He merely argues that he cannot bend.

As for Plaintiff's argument that the ALJ failed to "explain how plaintiff [sic] would be expected to arrive at his workplace" (Pl. Br 55-56), Plaintiff cites no authority for the proposition that an ALJ must explain how a claimant is able to get to work, or that a claimant must be able to drive or be able to be driven to work.  The Act requires that the agency demonstrate that work the claimant is able to perform is available in the economy. Plaintiff may "arrive at his workplace" however he wishes.  Moreover, and perhaps more to the point, as the Commissioner points out "the record simply does not support Plaintiff's argument that he cannot drive at all," and Dr. Neufeld, to whose opinions the ALJ accorded "partial weight," "opined that . . . 'the claimant's responses indicated that he would be capable of getting to and from a job in this regard.' " (Comm'r Br. 13-14) (quoting R. 1134).  Plaintiff has shown no error in the ALJ's RFC assessment.

## V.    Vocational Expert Testimony

Plaintiff claims the ALJ's reliance on the testimony of the vocational expert was erroneous because the hypothetical question did not include all of Plaintiff's limitations. However, as the Commissioner points out, none of the limitations suggested earlier in Plaintiff's Brief are borne out by the record.  Moreover, the hypothetical question included all of the limitations the ALJ found were supported by the record evidence.

Thererfore, it was not error for the ALJ to rely on the vocational expert's testimony in that regard.

Plaintiff also argues that the vocational expert "testified some employers of the jobs she identified as available . . . would require that workers pass a drug screen and someone taking narcotic pain medication, even if prescribed, would not be able to pass such a test."  (Pl. Br. 56).

As Plaintiff suggests, the vocational expert testified that some employers in the jobs she identified would require a drug screen, and would not allow exceptions for someone taking narcotic pain medication.  However, the vocational expert's testimony was much more nuanced than Plaintiff reports.  When asked if a hypothetical individual using an opiate medication such as Oxycontin or Percocet would be able to pass a drug screen, she testified:

> Well, it, it depends on what the employer is looking at.  You know, these are all hiring practices.  You know, sometimes ahead of time, the applicant will say, and have some sort of, you know, medical record or whatever from the doctor, stating these are the prescribed medications this person is on.  You know, they're not typically street drugs or whatever, since you'll test positive for narcotics.  And some employers will be okay with that.  Some employers are not okay with that.  If you're still-- if you're driving, operating machinery, whatever, they're not going to take on that liability of you being on a narcotic, even though it's prescribed.  And, and, like I said, the liability in the workplace.

(R. 639-40).  At that point, Plaintiff's counsel ended her questioning of the vocational expert and stated:  "I don't have anything further, Your Honor."  (R. 640).

31

Thus, the thrust of the testimony was that some employers who require drug screening will allow exceptions for prescribed narcotic medications and some will not, and it is more likely exceptions will be made where the employee is not driving or operating machinery.  Here, the ALJ specifically determined that Plaintiff should have a job not requiring driving (R. 503), and the representative jobs at issue, printed circuit board inspector, and lens inserter do not require operating machinery.  Therefore, these are jobs in which a greater number of employers will allow exceptions.  The vocational expert testified that there are a significant number of such jobs available for a hypothetical individual such as Plaintiff.

Plaintiff has shown no error in the decision at issue.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 20th  day of August 2015, at Kansas City, Kansas.


s:/ John W. Lungstrum _____
**John W. Lungstrum**
**United States District Judge**

32